IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| PARAGON METALS HOLDINGS LLC, PARAGON METALS LLC, STELLEX PARAGON METALS SPLITTER LP, and STELLEX CAPITAL INVESTORS, | § § § § § | No. 385, 2025 |
| | § § | Court Below—Superior Court of the State of |
| Plaintiffs Below, Appellants/ Cross-Appellees, | § § | Delaware |
| | § § | C.A. No. N21C-12-090 CCLD |
| v. | § § | |
| MICHAEL J. SMITH and THE PARAGON INDUSTRIAL HOLDINGS GROUP, INC., | § § § § | |
| | § § | |
| Defendants Below, Appellees/Cross-Appellants. | § § | |

Submitted: April 1, 2026
Decided: July 1, 2026

Before **SEITZ**, Chief Justice; **TRAYNOR** and **GRIFFITHS**, Justices.

Upon appeal from the Superior Court of the State of Delaware. **AFFRIMED in part, REVERSED and REMANDED in part.**

Sarah R. Martin, Esq., Samuel L. Moultrie, Esq., GREENBERG TRAURIG, LLP, Wilmington, Delaware; Joseph J. Mamounas, Esq. *(argued)*, GREENBERG TRAURIG, P.A., Miami, Florida; John L. McManus, Esq., GREENBERG TRAURIG, P.A., Fort Lauderdale, Florida, *for Appellants/Cross-Appellees.*

S. Michael Sirkin, Esq., Holly E. Newell, Esq., ROSS ARONSTAM & MORITZ, LLP, Wilmington, Delaware; Matthew T. Nelson, Esq. *(argued)*, Lawrence J. Murphy, Esq., Katherine L. Pullen, Esq., Adam T. Ratliff, Esq., WARNER NORCROSS & JUDD LLP, Detroit, Michigan, *for Appellees/Cross-Appellants.*

**GRIFFITHS**, Justice:

In August 2018, a group of corporate investors expressed interest in acquiring Paragon Metals LLC, an automobile components manufacturer, from its founder and then-CEO, Michael Smith. Around the same time, two of Paragon's largest customers informed Smith that they intended to materially decrease their future purchase orders. One customer intended to stop ordering select components from Paragon altogether; the other customer planned a significant reduction in future purchase orders over the next several years. The investors did not discover the exact nature and scope of these changes during their due diligence process – despite encountering several "red flags."

The investors and Smith entered into an agreement to sell the business for $100 million. In the agreement, Smith warranted that he was unaware of any material changes in business terms with Paragon's largest customers. The transaction closed in early 2019. After closing, the investors learned that two customers intended to reduce their business with Paragon. The decrease in orders caused the investors to default on a loan to finance the transaction. After infusing an additional $37 million into Paragon, the investors sued Smith for common law fraud. The investors claimed that they had relied on Smith's false warranties in the agreement when they entered into the transaction.

After a five-day trial, the Superior Court entered judgment in Smith's favor. The court agreed with the investors that Smith had made false representations in the agreement and that Smith intended to defraud them. But the court found that the investors were "willfully blind" to the falsity of Smith's warranties by not conducting reasonable due diligence. The court held that the investors' reliance on the false warranties was not justifiable and therefore they had not met their burden of proving their fraud claim. The investors appealed, and Smith cross-appealed.

For the reasons that follow, we affirm the Superior Court's conclusions that Smith's warranties were false, and that Smith intended to defraud the investors; but we reverse the court's holding that the investors' reliance on Smith's warranties was not justified. We remand the case to the trial court to consider damages.

## BACKGROUND

*A.     The Parties and the Customers*

Stellex Capital Investors LP and Stellex Paragon Metals Splitter LP (together, "Stellex") are affiliates of a private equity firm that "invests in companies with high-growth potential in automotive, specialty manufacturing, industrial, business services, aerospace, defense, and government services sectors."[1]

---

[1] App. to Appellants' Opening Br. at A440 [hereinafter A_] (Amended Compl. dated Dec. 19, 2023, at ¶ 10) [hereinafter Compl.].

Michael Smith founded Paragon Metals LLC ("Paragon") and served as its Chief Executive Officer.[2] Paragon manufactures automobile components, including bearing brackets that are used in the production of automobile transmissions.[3]

ZF Transmissions Gray Court, LLC ("ZF") and Fiat Chrysler Automobiles ("FCA") both make automobile transmissions. For years, ZF and FCA were two of Paragon's largest customers, regularly ordering high volumes of bearing brackets.[4] ZF recognized Paragon as its "sole supplier" of bearing brackets for 9HP48 and 9HP50 transmissions, ordering these brackets from Paragon.[5] ZF and FCA also maintained a separate business relationship with each other – ZF sold transmissions to FCA. These transmissions were made with bearing brackets that ZF bought from Paragon.[6]

### B.    *The Paragon Acquisition*

In August 2018, Stellex wrote to Smith expressing an interest in acquiring Paragon.[7] The parties soon started pre-transaction due diligence. During the due

---

[2] *Id.* (Compl. ¶ 11). Smith owned Paragon Metals LLC through Paragon Industrial Holdings Group, Inc.

[3] A11708 (Hearing Tr. dated Dec. 4, 2024, at 6:5–8) [hereinafter Dec. 4 Tr.].

[4] A448, 453 (Compl. ¶¶ 31, 49).

[5] A12419 (Trial Tr. dated Feb. 4, 2025, at 105:1–18) (Michael Cochran) [hereinafter Feb. 4 Tr.].

[6] Appellees'/Cross-Appellants' Answering Br. & Opening Br. on Cross-appeal at 8 (Dec. 4, 2025) [hereinafter Answering Br.].

[7] A11980 (Trial Tr. dated Feb. 3, 2025, at 72:2–15) (David Waxman) [hereinafter Feb. 3 Tr.]. Stellex ultimately acquired Paragon through Paragon Metals Holdings, LLC.

diligence process, Smith gave Stellex access to over 10,000 documents, including a five-year sales projection.[8] In the same month, ZF and FCA told Smith that they intended to buy fewer bearing brackets moving forward.[9] Smith updated the five-year sales projection with that information and sent the latest data to Stellex in October 2018.[10]

Paragon's business with ZF and FCA continued to shrink. In November 2018, a month after updating the sales projections, Smith learned that FCA would stop ordering 9HP48 transmissions from ZF, which utilized bearing brackets ZF purchased from Paragon.[11] As a result, ZF needed fewer bearing brackets from Paragon.[12] ZF communicated this change to Smith by letter dated November 15, 2018 (the "ZF Letter").[13] ZF also informed Smith that Paragon would no longer be its "sole supplier" of bearing brackets.[14] These changes amounted to more than $4 million in lost revenue for just 2019.[15]

---

[8] A11984 (Feb. 3 Tr. 76:12–21) (David Waxman).

[9] *See, e.g.*, App. to Answering Br. at B98–100 [hereinafter B_] (email dated Aug. 30, 2018).

[10] B106–07 (email dated Oct. 18, 2018).

[11] B114 (email dated Nov. 16, 2018).

[12] B115 (9HP48 FCA Program Cancellation Letter dated Nov. 15, 2018).

[13] *Id.*

[14] A12623 (Feb. 4 Tr. 309:10–20) (Michael Cochran).

[15] A14201–02 (Michael Smith Dep. dated Aug. 13, 2024, at 208:8–209:1) [hereinafter "Smith Dep."].

Given these substantial changes, ZF sought to amend its general contract with Paragon. ZF drafted a proposed contract amendment in which it specified its expected lower purchasing volume.[16] Smith insisted that ZF remove the specific numbers reflecting the declining volume from the contract and promised to pay ZF a $300,000 rebate.[17] Paragon had never offered ZF a rebate of this magnitude.[18] ZF agreed to remove the purchasing volume details from the contract amendment and accepted Smith's promise of the rebate. In December 2018, Smith executed the general contract amendment with ZF.[19]

### C.    Stellex's Due Diligence

As Smith and ZF amended their business terms, Stellex's due diligence on Paragon continued. Stellex hired professional legal, tax, insurance, and accounting experts in the automobile industry to facilitate the due diligence process, incurring $1 million in costs.[20] Even with a team of professionals, Stellex overlooked "red flags" concerning the future lower purchasing volume.

For example, on November 29, 2018, Stellex noticed a strike-through in a draft document, which read: "Mike says there's a letter from ZF saying [they're]

---

[16] A12475–80 (Feb. 4 Tr. 161:7–166:14) (Michael Cochran); B118–22 (ZF General Contract 2018 Amendment).

[17] A12477–78 (Feb. 4 Tr. 163:8–164:16) (Michael Cochran).

[18] A12638, A12640 (Feb. 4 Tr. 324:10–18, 326:8–13) (Michael Cochran).

[19] *See* B118–22 (ZF General Contract 2018 Amendment).

[20] A12553 (Feb. 4 Tr. 239:1–21) (Michael Cochran).

going to decrease their purchases."[21] When Stellex asked about the strike-through text, Smith explained that ZF did not intend to withdraw business from Paragon but would instead order more 9HP50 brackets while "decreas[ing] their purchase" of 9HP48 brackets.[22] In other words, Smith represented to Stellex that the purchase volume would be net-neutral. Stellex was satisfied with Smith's explanation and did not request to inspect the "letter from ZF."[23]

Stellex also met with ZF and FCA representatives as a part of its due diligence process. A few days before its meeting with ZF, Stellex prepared a list of topics it intended to discuss, including ZF's anticipated decrease in purchase volume from Paragon.[24] One day before the meeting, a ZF representative contacted Smith and asked him if Paragon had sent the $300,000 rebate.[25] At the meeting, for unknown reasons, Stellex did not ask ZF to explain the expected decrease in detail; instead, Stellex simply asked "is the business still good."[26] ZF confirmed that its collaboration with Paragon was "still good" and noted that there would be "some

---

[21] A12217–21 (Feb. 3 Tr. 309:17–313:22) (Bruce Swift). The "letter from ZF" (referred to in this decision as the "ZF Letter") announced FCA's cancellation of all future 9HP48 orders. B115 (9HP48 FCA Program Cancellation Letter dated Nov. 15, 2018).

[22] A12217–21 (Feb. 3 Tr. 309:17–313:22) (Bruce Swift).

[23] *Id.*

[24] A12343–44 (Feb. 4 Tr. 29:22–30:2) (Bruce Swift).

[25] A12437–40 (Feb. 4 Tr. 123:11–126:2) (Michael Smith).

[26] A12344–46 (Feb. 4 Tr. 30:14–32:7) (Bruce Swift).

noise . . . in the volumes."[27]  After meeting with Stellex, ZF emailed Smith that he should not "disappoint" ZF regarding the rebate that he had promised.[28]  Smith arranged for one of his overseas affiliates to wire the rebate to ZF so that the payment would not show on Paragon's books.[29]  Curiously, after this exchange about the rebate with ZF, Smith threw his work cell phone into the trash.[30]

Also, Stellex did not uncover the nature or scope of amended business terms during its meeting with FCA.  In fact, after speaking with an FCA representative, Stellex mistakenly thought that FCA's purchase volume in 2019 would stay the same as the previous year.[31]

Last, approximately a month before closing, Stellex overlooked an email from Smith that referenced the ZF Letter.[32]  An employee who worked for Smith drafted the email.  The email covered matters that the parties had to finalize before closing. The draft email referred to the ZF Letter and added it as an attachment.[33]  The employee submitted the draft email to Smith.[34]  Upon review, Smith removed the

---

[27] A12346–47 (Feb. 4 Tr. 32:5–33:13) (Bruce Swift).

[28] A12446–49 (Feb. 4 Tr. 132:1–135:16) (Michael Smith).

[29] *Id.*; A13922 (Michael Smith Dep. dated Feb. 27, 2024, at 74:10–24); *see also* B123 (Michael Smith email to LaTarte Paul at ZF dated Dec. 11, 2018).

[30] A14109 (Smith Dep. 69:3–14).

[31] A12206 (Feb. 3 Tr. 298:17–20) (Bruce Swift).

[32] *See* B442–446 (email thread dated Dec. 29, 2018).

[33] A12358–59 (Feb. 4 Tr. 44:19–45:7) (Bruce Swift).

[34] *Id.*

ZF Letter from the attachments.[35]  He also edited the email by summarizing the ZF Letter's contents in a few bullet points, noting that the parties should "Review Anticipated Sales & ZFBB Cancellation Letter" and "FCA Volume only is cancelled with ZFBB."[36]  Smith then forwarded the edited email to Stellex without the ZF Letter attached.  Stellex did not read the email and therefore missed the critical reference to the ZF Letter.[37]

### D.    The Agreement and Post-Closing Events

On December 14, 2018, the parties executed an Equity Interest Purchase Agreement (the "Agreement") to facilitate the acquisition of Paragon.[38]  In the Agreement, both parties made express warranties and acknowledgments. Specifically, in Article 3 of the Agreement, Smith warranted:

> § 3.8  No Material Adverse Effect.  Since December 31, 2017, no fact, event or circumstance has occurred or arisen that, individually or in combination with any other fact, event or circumstance, has had or would reasonably be expected to have a Material Adverse Effect.[39] Since December 31, 2017, [Paragon] has conducted the Business only in the ordinary course of business consistent with past practice.[40]
> . . .

---

[35] *Id.*

[36] B443 (email thread dated Dec. 29, 2018).

[37] A12032 (Feb. 3 Tr. 124:10–21) (David Waxman).

[38] A123 (Equity Purchase Agreement at 1) [hereinafter Agreement].

[39] The "Material Adverse Effect" ("MAE") in this section is defined as "a material adverse effect which has occurred to the business, operations, assets, [l]iabilities, condition (financial or otherwise) or operating results of [Paragon.]"  A189 (Agreement at Annex 1).

[40] A130 (Agreement at 8).

§ 3.12  Contracts and Commitments.  Except for as set forth on the attached Schedule 3.12, [Paragon] is not a party to or bound by . . . [a]ny long term of master supply agreement between [Paragon] and [the Customers][.][41]

. . .

§ 3.23  Customers and Suppliers. . . . Except as set forth on Schedule 3.23 and other than in the ordinary course of business, [Paragon] has not received any notice from [the Customers] to the effect that, and none of [Paragon] . . . or [Smith] has any [k]nowledge that, [the Customers] will stop, decrease the rate of, or change the terms (whether related to payment, price, or otherwise) with respect to, buying products from [Paragon][.][42]

In Article 5, Stellex acknowledged:

§ 5.10  Acknowledgment by Buyer.  [Stellex] has conducted to its satisfaction an independent investigation and verification of the financial condition, results of operations, assets, liabilities, properties and projected operations of [Paragon], and in making its determination to proceed with the transactions contemplated by this Agreement, [Stellex] has relied on the results of its own independent investigation and verification and the representations and warranties expressly and specifically set forth in Article 3 . . . of this Agreement . . . . [Smith] do[es] not make or provide, and [Stellex] hereby waives, any warranty or representation, express or implied, as to the quality, merchantability, fitness for a particular purpose, conformity to samples, or condition of [Paragon's] assets or any part thereto, except as set forth in Article 3.[43]

Notably, the Agreement did not disclose the ZF Letter, Paragon's loss of sole supplier status with ZF, or the rebate to ZF.

_____

[41] A132–33 (Agreement at 10–11).

[42] A144 (Agreement at 22).

[43] A150–51 (Agreement at 28–29).

10

The transaction closed on January 31, 2019, with Stellex acquiring Paragon for $100 million.[44] The day after closing, Stellex learned that FCA would no longer order 9HP50 and 9HP48 bearing brackets from Paragon after 2019, as it intended to make them in-house.[45] Stellex also discovered after closing that ZF was scheduled to scale back its 9HP48 bearing bracket orders starting in 2019.[46] With ZF and FCA significantly reducing their purchase volumes, Stellex soon defaulted on a loan that it had used to finance the transaction, bringing the newly acquired company to the verge of bankruptcy.[47] Stellex invested an additional $37 million to stabilize the company.[48]

### E.    The Lawsuit

In December 2021, Stellex sued Smith in the Superior Court for common law fraud. Stellex claimed that Smith's warranties in §§ 3.23 and 3.8 of the Agreement were false and that Stellex had relied on those false warranties in acquiring Paragon. The Superior Court held a five-day bench trial and entered judgment in Smith's favor.[49] The court concluded that Stellex had met its burden of proving that Smith's

---

[44] A451 (Compl. ¶ 42).

[45] A12836–38 (Trial Tr. dated Feb. 5, 2025, at 108:8–110:4) (Michael Cochran).

[46] B115 (letter dated Nov. 15, 2018).

[47] A457 (Compl. ¶¶ 61–62); A551 (Comerica Debt Commitment Letter to Stellex dated Dec. 14, 2018); A560 (Terms & Conditions of Commitment Letter at 1).

[48] A467–68 (Compl. ¶¶ 95–96).

[49] *Paragon Metal Holdings, LLC v. Smith*, 2025 WL 2531610, at *20 (Del. Super. Aug. 13, 2025) [hereinafter *Opinion*].

11

warranties were false and that Smith intended to defraud; but, given the multiple opportunities where Stellex could have discovered the amended business terms, the court held that Stellex's reliance on Smith's false warranties was not justifiable.[50] Thus, Stellex did not prove its common law fraud claim. Stellex appealed the court's holding on justifiable reliance, and Smith cross-appealed the court's holdings on falsity and scienter. Smith also claimed that the court applied the incorrect evidentiary standard when it assessed Stellex's common law fraud claim.

## STANDARD OF REVIEW

We review questions of law, including evidentiary standards, *de novo*.[51] We also review contract interpretation *de novo*.[52]

## ANALYSIS

A plaintiff claiming common law fraud must prove five elements: (1) the defendant made a false representation; (2) the defendant knew that the representation was false; (3) the defendant intended to induce plaintiff to act; (4) the plaintiff acted in justifiable reliance on the defendant's false representation; and (5) the plaintiff suffered damages.[53]

---

[50] *Id.* at *18–20.

[51] *Williams v. Hall*, 2026 WL 35922, at *2 (Del. Jan. 6, 2026) (TABLE).

[52] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1158 (Del. 2010).

[53] *Johnson & Johnson v. Fortis Advisors LLC*, 352 A.3d 229, 269 (Del. 2026).

We first address the threshold issue Smith raises – whether the proper burden of proof for a common law fraud claim is "preponderance of the evidence" or "clear and convincing evidence." We then address Smith's arguments on the first two elements of common law fraud. Lastly, we address Stellex's three arguments regarding justifiable reliance.

### A. Evidentiary Standard for Fraud Claims

Smith asserts that the Superior Court erred in applying the preponderance of the evidence standard to Stellex's common law fraud claim. According to Smith, the stricter standard of clear and convincing evidence should apply, and under that standard, we should vacate the court's scienter finding.[54] He argues "uncertainty" exists as to the proper standard of proof for fraud claims.[55] Yet, just last year, we affirmed the Superior Court's application of the preponderance standard in a fraud case.[56] In Delaware, the applicable evidentiary standard for common law fraud is a preponderance of the evidence.[57]

---

[54] Answering Br. 49–50.

[55] *Id.* at 53 (quoting *Project Boat Hldgs, LLC v. Bass Pro Grp., LLC*, 2019 WL 2295684, at *1 (Del. Ch. May 29, 2019)).

[56] *Sofregen Medical Inc. v. Allergan Sales, LLC*, 2024 WL 4297665, at *16 (Del. Super. Sep. 26, 2024) ("While in some jurisdictions fraud must be shown by clear and convincing evidence, the burden of proof in a fraud case in Delaware is by a preponderance of the evidence."), *aff'd*, 349 A.3d 1148 (Del. 2025).

[57] Smith contends that historically, Delaware courts "uniformly required fraud claims to satisfy a clear-and-convincing or equivalent intermediate evidence standard." Answering Br. 50. He points to a few cases from the 18th and the 19th century that required fraud be "clearly proved" or "clearly

Smith argues that fraud claims should be subject to a higher evidentiary standard because fraud carries a "moral stigma" of "quasi-criminal wrongdoing."[58] We disagree. We have held that serious consequences alone are not "enough to raise the standard of proof," as "serious consequences follow from application of the 'preponderance of the evidence' standard in all fields of civil law, including contract and tort."[59] We accept the argument that an allegation of fraud tends to profoundly, or even irreparably, affect a corporation's business, but such serious consequences do not demand a higher evidentiary standard.

Last, Smith argues that "[p]roving fraud typically requires circumstantial evidence. Because circumstantial evidence creates a greater risk of error, a higher evidentiary threshold is warranted."[60] We disagree with this premise. There are existing procedural rules that are adequate to guard against this "greater risk of error." Superior Court Civil Rule 9 requires that "[i]n all averments of fraud . . . the circumstances constituting fraud . . . shall be stated with particularity."[61] Under this heightened pleading standard, "pleading a claim of fraud has at its core the charge

---

established" by the evidence. *Id.* at 50–51 (quoting *Killen v. Purdy*, 99 A. 537, 538 (Del. 1916); *Griffin v. Star Printing Co.*, 74 A. 1072, 1072 (Del. 1910)). However, these authorities do not support Smith's position, as none of them explicitly articulated the "clear and convincing evidence" standard.

[58] Answering Br. 54.

[59] *G.L. v. S.D.*, 403 A.2d 1121, 1126 (Del. 1979).

[60] Answering Br. 53.

[61] Super. Ct. Civ. R. 9(b).

that the defendant knew something"; and "there must, at least, be sufficient well-pled facts from which it can reasonably be inferred that this 'something' was knowable and that the defendant was in a position to know it."[62] This strict requirement for particularity at the pleading stage is a sufficient safeguard against meritless fraud claims. Accordingly, we decline to elevate the evidentiary standard for fraud claims.

### B. Falsity and Scienter

Having clarified the applicable evidentiary standard, we next address the court's judgment on the merits. We start with Smith's arguments that the court erred in its holdings against him on falsity and scienter.

#### 1. Smith's Warranties Were False

The Superior Court held that the warranties in §§ 3.23 and 3.8 of the Agreement were false at the time of closing.[63] Specifically, regarding § 3.23, the court found that, ZF told Smith before closing that it would significantly reduce its purchase volume and stop ordering 9HP48 brackets for FCA. This finding undercut the warranty – that Smith was unaware of any substantial changes in business terms

---

[62] *Valley Joist BD Holdings, LLC v. EBSCO Indus., Inc.*, 269 A.3d 984, 988 (Del. 2021).

[63] *Opinion* at *8.

15

with Paragon's largest customers.[64] Smith does not challenge the court's factual finding. Instead, he argues that the court erred in interpreting the warranty in § 3.23.

Smith contends that Paragon never secured binding terms with ZF or FCA that required them to buy a fixed quantity of products.[65] For example, with ZF, the general contract provided for a two-week "firm window," during which ZF could not cancel or amend its orders.[66] Smith relies on this "firm window" to argue that the customers' purchase quantity would naturally vary from order-to-order every two weeks, and that variation would not be a substantial change in the "terms" that he warrantied against.[67] We are not persuaded by Smith's interpretation.

The Superior Court noted that Paragon and ZF's general contract explicitly provided for its "term" to last "seven years from the effective date," and Smith himself testified that the amendment to the general contract he executed with ZF in December 2018 "was going to continue to at least [] 2027 and maybe even further."[68] Similarly, the court found that Paragon's contract with FCA also mandated that Paragon "have a tooling and production plan in place that will enable [Paragon] to

---

[64] *Id.* at *8, *13.

[65] Answering Br. 60–65.

[66] A14248–49 (Smith Dep. 268:19–269:9).

[67] *Id.*

[68] *Opinion* at *10.

16

supply FCA['s] . . . *annual* requirement."[69]  The plain language in the ZF and FCA general contracts evidenced the long-term nature of their deals.  That language supports the court's reading that the word "terms" in § 3.23 referred to Paragon's long-term business arrangements with its customers.

And despite Smith's arguments to the contrary, changes in "terms" are not limited to changes in sale volumes.  Black's Law Dictionary defines "term" as "a contractual stipulation."[70]  It further defines "material term" as "[a] contractual provision dealing with a significant issue such as subject matter, price, payment, quantity, quality, duration, or the work to be done."[71]  Section 3.23 states that a change in "terms" shall cover changes "related to payment, price, or otherwise [] with respect to [] buying products from [Paragon]."[72]  Under this definition, a "change in terms" could include the loss of an entire category of business.  Because Smith knew at the time of closing that FCA would no longer order 9HP48 brackets, we agree with the trial court that the warranty in § 3.23 was false.

As for § 3.8, Smith argues that the court erred in holding that the decrease in the ZF's and FCA's purchase volumes "falsified [Smith's] representations in Section

---

[69] *Id.* (emphasis added).

[70] *Term*, BLACK'S LAW DICTIONARY (12th ed. 2024).

[71] *Id*.

[72] A144 (Agreement at 22).

3.8."[73]  Smith misreads the Superior Court's holding.  The court did not conclude that Smith's warranty under § 3.8 was false because Smith knew that the customers would decrease their purchase volumes.  Instead, it found that "[t]rial evidence showed that these extensive changes to Paragon's business with two of its top three customers[] made it reasonably likely that [Paragon] would default on its bank loan."[74]  The court concluded that Paragon's imminent risk of bankruptcy was a "material adverse effect" that ran against Smith's warranty in § 3.8.[75]  Smith does not challenge that finding.  We therefore affirm the court's holding that Smith's warranties were false at the time of closing.

### 2. Smith Intended to Defraud

The Superior Court held that Stellex proved, by a preponderance of the evidence, that Smith intended to defraud Stellex.  We see no error in the court's conclusion that Stellex proved scienter.  "Proof by a preponderance of the evidence means proof that something is more likely than not.  It means that certain evidence, when compared to the evidence opposed to it, has the more convincing force and makes you believe that something is more likely true than not."[76]  "Plaintiffs can

---

[73] Answering Br. 60.

[74] *Opinion* at *14.

[75] *Id.*

[76] *R.I. Off. of Gen. Treasurer on Behalf of Employees' Ret. Sys. of R.I. v. Paramount Glob.*, 331 A.3d 179, 190 (Del. Ch. 2025).

18

establish scienter . . . by setting forth facts that constitute circumstantial evidence of either reckless or conscious behavior."[77]

To prove scienter, Stellex offered the following evidence at trial: Smith deleted the ZF letter as an attachment to his email to Stellex; Smith insisted that ZF remove details concerning the declining volume from its general contract amendment; Smith did not tell Stellex that Paragon had lost its sole supplier status with ZF; Smith rerouted the rebate payment to ZF through a foreign affiliate to keep it off-the-books; Smith "destroyed his company issued phone despite having no legal right to do so"; and Smith knew, as early as November 2018, that the sales projection he sent in October 2018 was no longer accurate yet he never updated the data with Stellex.[78] These facts are sufficient to support a finding that Smith "more likely than not" intended to conceal the truth and to induce Stellex to enter the transaction through misrepresentations.

### C.    *Justifiable Reliance*

We now turn to the court's holding that Stellex's reliance on Smith's false warranties was not justifiable. Stellex advances three arguments to challenge this holding. First, it argues that the court erred when it ignored § 5.10 and "open[ed] up

---

[77] *Deloitte LLP v. Flanagan*, 2009 WL 5200657, at *8 (Del. Ch. Dec. 29, 2009) (internal quotation marks omitted).

[78] *Opinion* at *15–18.

19

inquiry into [Stellex's] due diligence" and extra-contractual documents.[79] Second, Stellex contends that it had no obligation to conduct due diligence and that, therefore, the court erred in holding that its failure to do so barred its justifiable reliance on Smith's warranties.[80] And third, Stellex argues that the court erred in holding that Stellex "should have known" the truth behind Smith's false warranties but chose to be "willfully blind" to the facts.[81] We address each argument in turn.

### 1.     The "Anti-Reliance Clause" Does Not Protect Stellex

Stellex cannot invoke the anti-reliance clause in the Agreement to establish justifiable reliance because Stellex was not the intended beneficiary of the clause. The intended beneficiary of § 5.10 is Smith – not Stellex. In *Johnson & Johnson*, we held that when a contract "contains a one-sided anti-reliance clause disclaiming reliance by only one party, and . . . the other party to the contract made no comparable promise . . . [the] clause cannot be invoked to bar the other party's post-closing claims for intentional extra-contractual fraud."[82] In other words,

---

[79] Appellants' Opening Br. 23 (Nov. 6, 2025) [hereinafter Opening Br.].

[80] *Id.* at 24–25.

[81] *Id.* at 26. Stellex also claims that its reliance on some of Smith's extra-contractual representations was reasonable. But the argument has no merit, as the "anti-reliance clause" bars Stellex from relying on any extra-contractual representation made by Smith and Stellex appears to concede this point. *See* Opening Br. 25 ("If Buyers had relied on the 'ZF/FCA customer meetings,' Ducker's diligence report,' Smith's e-mail on the 'softening automotive market,' and 'Smith's communications to Stellex' to form their fraud claim, the reliance on such information would be barred as unjustifiable." (citation omitted)). Therefore, we will not discuss that issue here.

[82] *Johnson & Johnson*, 352 A.3d at 274.

sophisticated parties to a transaction "may allocate the risk of extra-contractual fraud,"[83] but, in agreeing to a one-sided anti-reliance clause, only one party "contractually promise[s] that it did not rely upon statements outside the contract's four corners in deciding to sign the contract."[84] Here, § 5.10 protects Smith from potential fraud claims based on extra-contractual representations. It cannot be used to establish justifiable reliance for an intra-contractual fraud claim against Smith.

### 2. Stellex Had No Obligation to Conduct Due Diligence

Next, we address Stellex's argument that the court erred in finding that it had a duty to conduct reasonable due diligence. The court based its conclusion on § 5.10 of the Agreement, where Stellex stated that it "has conducted to its satisfaction an independent investigation . . . and . . . has relied on the results of its own independent investigation and verification[.]"[85] The court interpreted this language as "requir[ing] [Stellex] to conduct reasonable diligence" and "impos[ing] upon [Stellex] a diligence obligation."[86] We disagree.

As we explained above, § 5.10 is an anti-reliance clause in which Stellex waived potential extra-contractual fraud claims against Smith. In agreeing to the provision, Stellex intended to waive a right, rather than assume an obligation.

---

[83] *Id.* at 273.

[84] *Id.*

[85] A150 (Agreement at 28).

[86] *Opinion* at *18.

21

Further, even if the provision required Stellex to perform some due diligence, it did not impose an objective standard requiring that the diligence be "reasonable." The plain text of § 5.10 – "[Stellex] has conducted *to its satisfaction* an independent investigation and verification"[87] – shows that the diligence need only satisfy Stellex's own subjective standard of completeness. Nothing in the Agreement purports to hold Stellex accountable should it fail to perform reasonable or effective due diligence. Thus, even if Stellex's due diligence was insufficient, that fact does not prevent Stellex from relying on Smith's warranties in the Agreement.[88]

### 3. Stellex's Reliance on Smith's Warranties Was Reasonable

Finally, we address Stellex's argument that the Superior Court erred in holding that Stellex "should have known" the truth behind Smith's misrepresentations but remained "willfully blind."[89] Willful blindness has two parts. A party must "subjectively believe that there is a high probability that a fact exists" and "take deliberate actions to avoid learning of that fact."[90] In other words, a willfully blind party "is one who takes deliberate actions to avoid confirming a high

---

[87] A150 (Agreement at 28).

[88] *See Urvan v. AMMO*, 2024 WL 863688, at *12 (Del. Ch. Feb. 27, 2024) (holding that even when a plaintiff had access to contradictory extra-contractual information, "[a] buyer justifiably may rely on contractual representations.").

[89] *See Opinion* at *20 ("Although [Smith's] disclosures could have been more explicit, the evidence shows that [Stellex] had at least some understanding of the information underlying their fraud claim. A party that "had means of obtaining knowledge" cannot claim a lack of knowledge based on "willful blindness.").

[90] *Glob.-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011).

22

probability of wrongdoing and who can almost be said to have actually known the critical facts."[91]

The court found that Stellex "knew or should have known about Section 3.23's and Section 3.8's falsity before [c]losing."[92] The court reasoned that Stellex's failure during due diligence "defeat[ed] justifiable reliance," because "a party is not excusably ignorant if it is willfully blind to the relevant facts."[93] We disagree and find that the court erred in applying stringent "willful blindness" to these circumstances.

Determining what constitutes "reasonable" reliance can be difficult, as the line lies somewhere between actual knowledge and negligence.[94] On one hand, "it is axiomatic that a plaintiff does not justifiably rely on a defendant's misrepresentation if the plaintiff knows that the representation is false."[95] On the other, a plaintiff's "failure to discover the fraud through due diligence does not excuse it."[96] Although

---

[91] *Id.*

[92] *Opinion* at *20.

[93] *Id.* at *18.

[94] *Arwood v. AW Site Servs., LLC*, 2022 WL 705841, at *24 (Del. Ch. Mar. 9, 2022).

[95] *Id.*

[96] *Id.*

Delaware reveres freedom of contract, "contracts may not insulate a party from damages or rescission resulting from the party's fraudulent conduct."[97]

Nothing on the face of §§ 3.23 or 3.8 gave Stellex reason to doubt the truth of the warranties. Instead, when Stellex raised questions, Smith concealed the truth.[98] When Stellex questioned Smith about the strike-through language that said ZF was "going to decrease their purchases,"[99] Smith was untruthful. He told Stellex that ZF and FCA were going to shift their purchase orders from one bracket type to another and would not decrease the total quantity of brackets they purchased.

Smith stresses that he placed Stellex on notice of Paragon's declining orders by sending it an email that referred to the ZF Letter and that Stellex should have read the email.[100] Yet, in the same email, Smith wrote that he would review the listed items with Stellex in ten days.[101] It therefore should not have altered the court's analysis that Stellex did not prioritize reading and digesting the email when Smith stated in the same email that he would discuss it with Stellex at a later date.

---

[97] *Express Scripts, Inc. v. Bracket Holdings Corp.*, 248 A.3d 824, 830 (Del. 2021) (quoting *Abry Partners V, L.P. v. F & W Acquisition LLC*, 891 A.2d 1032, 1059 (Del. Ch. 2006)).

[98] *See NetApp, Inc. v. Cinelli*, 2023 WL 4925910, at *16 (Del. Ch. Aug. 2, 2023) (holding that the plaintiff's reliance on the company's financial statements was justified because it "had no reason to investigate whether [the company's] financial submissions recorded intracompany transactions that lacked economic substance.").

[99] A12217–21 (Feb. 3 Tr. 309:17–313:22) (Bruce Swift).

[100] Answering Br. 41.

[101] B442 (email thread dated Dec. 29, 2018).

The record before us does not show that Stellex took deliberate actions to avoid learning of Paragon's amended business terms with its customers. Stellex's trust in Smith, while perhaps naïve, did not amount to deliberate action to avoid discovering the truth. Given Smith's efforts to conceal the truth, he should not have been surprised when Stellex did exactly what he intended – it justifiably relied on his false warranties in the Agreement.

## CONCLUSION

The judgment of the Superior Court is affirmed as to falsity and scienter, reversed as to justifiable reliance, and remanded to the Superior Court to assess damages consistent with this opinion.